**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BAY.ORG, *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> RYAN ZINKE, *et al.*, <br><br> Defendants, <br><br> and <br><br> STATE WATER CONTRACTORS, *et al.*, <br><br> Defendant-Intervenors. | **Case No. 1:17-cv-01176 LJO-EPG** <br><br> **MEMORANDUM DECISION AND ORDER DENYING MOTION TO COMPLETE THE ADMINISTRATIVE RECORD AND GRANTING MOTION TO CONSIDER EXTRA-RECORD EVIDENCE (ECF NO. 53)** |

## I. <u>INTRODUCTION</u>

On June 29, 2017, Plaintiffs, a coalition of environmental interest groups, filed the currently operative Complaint, which includes a single claim brought under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*., and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*., against the United States Fish and Wildlife Service ("FWS"), an office of the U.S. Department of the Interior, as well as the Secretary of the Interior and FWS's Acting Director. ECF No. 1. The Complaint concerns FWS's Biological Opinion ("BiOp"), issued under Section 7 of the ESA, regarding the impacts of California's proposed WaterFix project ("WaterFix") on the endangered Delta Smelt. *Id*. It is alleged that as part of WaterFix, the Bureau of Reclamation ("Bureau" or "Reclamation") and the California Department of Water Resources ("DWR") propose to construct three new water intakes on the Sacramento River, each capable of diverting 3,000 cubic feet per second ("cfs") of water. *Id*. at ¶ 2. The Bureau and DWR also propose to construct two tunnels that will transport water from these intakes to

existing pumping plants in the South Delta, bypassing up to 9,000 cfs of water underneath (instead of through) the Sacramento-San Joaquin River Delta. *Id.*

Federal Defendants lodged the administrative record ("AR") on June 20, 2018, with a corrected version lodged on July 3, 2018. ECF Nos. 49 & 50. Plaintiffs now move for inclusion of certain additional documents in the AR. ECF No. 53. In the alternative, they move for those same documents to be considered by the Court as extra-record evidence. *Id.* In their opposition, Federal Defendants agreed to include certain of the requested documents in the AR. ECF No. 59. As to the remaining 14 documents, Federal Defendants oppose their inclusion in the AR or their consideration as extra-record evidence. *Id.* Plaintiffs filed a reply. ECF No. 62. Having deemed the matter suitable for decision on the papers pursuant to Local Rule 230(g), ECF No. 65, the Court hereby DENIES Plaintiffs' motion to supplement the AR, but GRANTS Plaintiffs' motion to consider extra record evidence.

## II. <u>BACKGROUND</u>

"Under the ESA, the Secretary of the Interior and the Secretary of Commerce are charged with identifying threatened and endangered species and designating critical habitats for those species." *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 779 (9th Cir. 2014) (citing 16 U.S.C. § 1533). FWS and the National Marine Fisheries Service ("NMFS") administer the ESA on behalf of the Departments of the Interior and Commerce, respectively[1]. *See* 50 C.F.R. §§ 17.11, 222.101(a), 223.102, 402.01(b). ESA Section 7(a)(2) imposes a procedural duty on the federal agencies to consult with the FWS or NMFS, depending on the protected species, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitats of listed species. 16

---

[1] Generally, FWS has jurisdiction over species of fish that either (1) spend the major portion of their life in fresh water, or (2) spend part of their lives in estuarine waters, if the remaining time is spent in fresh water. *See Cal. State Grange v. Nat'l Marine Fisheries Serv.*, 620 F. Supp. 2d 1111, 1120 n.1 (E.D. Cal. 2008), *as corrected* (Oct. 31, 2008). NMFS is granted jurisdiction over fish species that (1) spend the major portion of their life in ocean water, or (2) spend part of their lives in estuarine waters, if the remaining portion is spent in ocean water. *Id.* FWS exercises jurisdiction over the delta smelt; NMFS exercises jurisdiction over the winter-run and spring-run Chinook salmon.

U.S.C. § 1536(a)(2). An agency "action" is defined to mean "all activities or programs of any kind authorized, funded, or carried out" by federal agencies, including, among other things, the granting of licenses and permits. *See* 50 C.F.R. § 402.02. "If a contemplated agency action may affect a listed species, then the agency must consult with the [relevant wildlife agency, FWS or NMFS,] either formally or informally." *American Rivers v. NMFS*, 126 F.3d 1118, 1122 (9th Cir. 1997).

More specifically, the ESA Section 7 consultation process normally begins with the preparation by the "action agency" (i.e., the agency proposing the project) of a "biological assessment" ("BA") designed to determine whether any listed species "is likely to be affected" by the action. 16 U.S.C. § 1536(c)(1). If the BA determines that a threatened or endangered species "is likely to be affected," the agency must formally consult with the FWS or NMFS (sometimes referred to generically as "wildlife agencies"). *See id*. § 1536(a)(2); 50 C.F.R. § 402.14. Formal consultation results in the issuance of a BiOp by the relevant wildlife agency. *See id*. § 1536(b).

If the BiOp concludes that the proposed action would jeopardize the species or destroy or adversely modify critical habitat, *see id*. § 1536(a)(2), then the action may not go forward unless the wildlife agency can suggest a "reasonable and prudent alternative[]" ("RPA") that avoids jeopardy, destruction, or adverse modification, *id*. § 1536(b)(3)(A). If the BiOp concludes that jeopardy is not likely and that there will not be adverse modification of critical habitat, or that there is an RPA to the agency action that avoids jeopardy and adverse modification and that the incidental taking of endangered or threatened species will not cause jeopardy, the wildlife agency shall issue an "Incidental Take Statement" ("ITS") which, if followed, exempts the action agency from the prohibition on takings found in Section 9 of the ESA. 16 U.S.C. § 1536(b)(4); *Aluminum Co. of Am. v. Administrator, Bonneville Power Admin.*, 175 F.3d 1156, 1159 (9th Cir. 1999).

The document challenged in this case is a BiOp prepared by FWS relating to the WaterFix proposal. The WaterFix project is at least in part an outgrowth of several rounds of planning for the long-term operation of the federal Central Valley Project ("CVP") and State Water Project ("SWP").

Presently, the CVP and SWP are operated in coordination according to a Coordinated Operations Agreement ("COA") between Reclamation and DWR. FWS0347838. Two BiOps in turn regulate the coordinated CVP/SWP operations: one issued in 2008 by FWS and another issued in 2009 by NMFS. *See* FWS0347834-36. Both BiOps contain RPAs designed to avoid jeopardy to listed species. *Id*.

Most relevant to the instant motion is an RPA in the 2008 FWS BiOp pertaining to flows in a branch of the San Joaquin River system referred to as "Old and Middle Rivers" ("OMR"), part of a system of channels in the Delta that lead to the CVP/SWP pumping plants in the south Delta. *See* FWS0217140. Pumping operations can cause flows in OMR to reverse, resulting in "negative" or "reverse" OMR flows. *See* FWS0000455. "Unsurprisingly, the 2008 BiOp found that as the OMR flows became increasingly negative, the entrainment risk and accompanying population loss increased accordingly, thereby threatening the smelt population's continuing viability." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 606 (9th Cir. 2014). The 2008 FWS BiOp RPA also set up an "adaptive management" system whereby, among other things, an interagency group of biologists known as the Smelt Working Group helps to monitor conditions for Delta smelt and makes recommendations regarding OMR flows. *See* FWS0000523-526; FWS0217010-11. In addition, as some of the documents Plaintiffs seek to add to the record demonstrate, in certain recent drought years, DWR and Reclamation have requested and received permission to deviate from certain state-mandated Delta outflow requirements as well as from the OMR flow restrictions contained in the 2008 FWS BiOp RPA. *See Obegi Decl.* at Exs. N & R.

## III. DISCUSSION

### A.     Scope of the Dispute

The documents remaining in dispute can be divided into two broad categories: (1) documents generated by the Smelt Working Group between December 2014 and January 2016 as well as FWS's responses to the Smelt Working Group's recommendations; and (2) documents generated in 2014 and 2015 pertaining to requests to re-initiate consultation on the 2008 FWS BiOp in light of proposed

changes to CVP and SWP operations in response to then-present drought conditions. As mentioned, Plaintiffs first move to compel the inclusion of these documents in the AR; alternatively, they move for consideration of them as extra-record evidence.

This Court recently addressed a somewhat similar set of disputes regarding the administrative record lodged in *Golden Gate Salmon Association, et al., v. Wilbur Ross, et al*., 1:17-cv-01172 LJO EPG, a related case concerning the impact of the WaterFix project on listed salmonid species. *See* 1:17-cv-01172, ECF No. 53, 2018 WL 3129849 (E.D. Cal. June 22, 2018) ("*Golden Gate* AR Order").

**B.    Standards of Decision**

     **1.    Motion to Compel Inclusion of Documents in the AR**

In the context of claims arising under the APA, the scope of judicial review is limited to "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142 (1973). The administrative record is "not necessarily those documents that the agency has compiled and submitted as 'the' administrative record." *Thompson v. U.S. Dept. of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (internal citation omitted). Rather, "'[t]he whole record' includes everything that was before the agency pertaining to the merits of the decision." *Portland Audubon Soc'y v. Endangered Species Comm*., 984 F.2d 1534, 1548 (9th Cir. 1993) (internal citation omitted). "The 'whole' administrative record, therefore, consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson*, 885 F.3d at 555.

> An incomplete record must be viewed as a fictional account of the actual decisionmaking process. When it appears the agency has relied on documents or materials not included in the record, supplementation is appropriate.

*Portland Audubon*, 984 F.2d at 1548 (internal quotations and citations omitted). "A satisfactory explanation of agency action is essential for adequate judicial review, because the focus of judicial review is not on the wisdom of the agency's decision, but on whether the process employed by the

agency to reach its decision took into consideration all the relevant facts." *Asarco, Inc. v. U.S. Environmental Protection Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980).

However, the record does not include "every scrap of paper that could or might have been created" on a subject. *TOMAC v. Norton*, 193 F. Supp. 2d 182, 195 (D.D.C. 2002).

> A broad application of the phrase "before the agency" would undermine the value of judicial review: Interpreting the word "before" so broadly as to encompass any potentially relevant document existing within the agency or in the hands of a third party would render judicial review meaningless. Thus, to ensure fair review of an agency decision, a reviewing court should have before it neither more nor less information than did the agency when it made its decision.

*Pac. Shores Subdivision v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006) (internal citations and quotations omitted).

An agency's designation and certification of the administrative record is entitled to a "presumption of administrative regularity." *McCrary v. Gutierrez*, 495 F. Supp. 2d 1038, 1041 (N.D. Cal. 2007) (citing *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993)). This requires courts to presume that public officials have discharged properly their official duties. *Id*. It is the burden of the party seeking to supplement the record to overcome this presumption by producing clear evidence to the contrary. *Bar MK*, 994 F.2d at 740; *Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1232 (E.D. Cal. 2013). Put another way, to rebut the presumption of regularity, a plaintiff "must put forth concrete evidence" to show that the record is incomplete. *Pac. Shores,* 448 F. Supp. 2d at 6 (cited in *California v. U.S. Dep't of Labor*, No. 2:13-CV-02069-KJM, 2014 WL 1665290, at *5 (E.D. Cal. Apr. 24, 2014)). Plaintiffs cannot meet their burden "simply by asserting that the documents are relevant, were before or in front of the [agency] at the time it made its decision, and were inadequately considered"; instead, Plaintiffs "must identify reasonable, non-speculative grounds for [their] belief that the documents were considered by the agency and not included in the record." *Id*.

## 2. **Motion to Consider Extra-Record Documents**

Under most circumstances, in a case such as this one governed by the APA's record rules, a

court's review is limited to "the administrative record already in existence." *Camp*, 411 U.S. at 142. As the Ninth Circuit emphasized in *San Luis v. Jewell*:

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry. . . .
>
> The factfinding capacity of the district court is thus typically unnecessary to judicial review of agency decisionmaking.

747 F.3d at 602 (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). The Ninth Circuit has further cautioned that "[t]here is a danger when a reviewing court goes beyond the record before the agency," as this "inevitably leads the reviewing court to substitute its judgment for that of the agency." *Id.* (internal quotation omitted). Accordingly, a court should not review "the evidence to determine the correctness or wisdom of the agency's decision . . . even if the court has also examined the administrative record." *Id.* (internal quotation omitted). "If the reviewing court cannot find substantial evidence in the record, it should not compensate for the agency's dereliction by undertaking its own inquiry into the merits," *id.* (internal quotation omitted); rather, it "should remand to the agency for further proceedings." *Id.* at 603 (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)).

The Ninth Circuit has, however, articulated four "narrowly construed" exceptions to this general rule, where

> (1) supplementation is necessary to determine if the agency has considered all factors and explained its decision; (2) the agency relied on documents not in the record; (3) supplementation is needed to explain technical terms or complex subjects; or (4) plaintiffs have shown bad faith on the part of the agency.

*Id.* (quoting *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010)). However, a court must approach these exceptions with caution, lest "the exception . . . undermine the general rule." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). "Moreover, before

supplemental material may be considered under any of these exceptions, a plaintiff must first make a showing that the record is inadequate." *Univ. of Washington v. Sebelius*, No. C11-625RSM, 2011 WL 6447806, at *2 (W.D. Wash. Dec. 22, 2011) (citing *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1437 (9th Cir. 1988)). A plaintiff bears the burden of demonstrating that the administrative record is so inadequate that judicial review would be effectively frustrated. *See Animal Defense*, 840 F.2d at 1438.

## C.    Smelt Working Group Documents

Plaintiffs seek inclusion in the record of the following documents issued by the Smelt Working Group during 2014, 2015, and 2016, along with a related document authored by FWS explaining FWS's response to one Smelt Working Group recommendation:

- Exhibit E - December 16, 2014 Smelt Working Group Notes.

- Exhibit F - December 29, 2014 Smelt Working Group Notes.

- Exhibit G - January 5, 2015 Smelt Working Group Notes.

- Exhibit H - January 11, 2016 Smelt Working Group Notes.

- Exhibit I - January 14, 2016 FWS Determination [Re January 11, 2016 Smelt Working Group Recommendation].

*See* Declaration of Douglas Obegi ("Obegi Decl."), Ex. 53-2, Exhibits E-I. Exhibits E-H are notes from the Smelt Working Group's meetings, which review conditions on the ground and make recommendations for actions to protect Delta smelt. For example, Exhibit E contains Smelt Working Group notes from December 16, 2014. *See* ECF No. 53-7. Among other things, the December 16, 2014 notes indicate that "[a]fter a review of current Delta smelt distribution and salvage[2] data, and current

[2] The Ninth Circuit succinctly summarized what "salvage" is in *San Luis v. Jewell*:

> The CVP operates the Jones Pumping Plant, capable of diverting 4,600 cubic feet per second (cfs). Nearby, the SWP operates the Harvey O. Banks Pumping Plant, with a capacity of 10,300 cfs, although it generally operates at or below 6,680 cfs. BiOp at 82, 108, 159–60. The plants have been constructed with louvers that allow water to pass through into the pumping plant, but will prevent most fish from entering the plants. The process of the fish entering the plants, known as entrainment, traps some 52 different

8

Delta conditions, the Working Group recommends that [RPA Component 1, Action 1][3] be implemented

immediately." *Id*. at 1. Plaintiffs assert, and Federal Defendants make no effort to refute, that these

recommendations were not adopted by FWS or implemented by Reclamation, nor were the similar

recommendations reflected in Exhibits F-H. *See* Obegi Decl., Ex. I (FWS determination not to

implement January 11, 2016 Smelt Working Group recommendations set forth in Ex. I).

Plaintiffs point out that FWS's WaterFix BiOp proposes to continue use of many of the same

processes and working groups, such as the Smelt Working Group, used by the 2008 FWS BiOp to

manage OMR flows. *See* FWS0347924 (BiOp 263); *see also* FWS0207825 (BA 6-90) ("Real-time

management of entrainment risk would also occur (if needed), in a manner similar to the existing Smelt

Working Group process."). Plaintiffs argue that "[b]ecause the WaterFix BiOp states that the Smelt

Working Group (or a similar) process will continue under WaterFix, FWS must have considered this

process – both the Smelt Working Group recommendations and the agency's decisions whether to

follow those recommendations – in issuing the WaterFix BiOp." ECF No. 53-1 at 18. More specifically,

it is Plaintiffs' position that FWS must have considered how the Smelt Working Group process has

functioned in the past in order to rely on that process as a source of future protection for delta smelt

under WaterFix. ECF No. 62 at 3.

As this Court recently explained in the *Golden Gate* AR Order, "supplementation of an

---

> species of fish. BiOp at 67. The salvaged fish are hauled in trucks injected with oxygen
> and released at sites on the Sacramento and San Joaquin Rivers. BiOp at 67, 145. Over a
> recent 15–year period, more than 110 million fish were salvaged from the Jones and
> Banks facility. BiOp at 160. This number, however, greatly underestimates the number of
> fish actually entrained at the facilities, because fish less than 30 mm (1.2 inches) are not
> efficiently collected at the louvers. BiOp at 160–61. Smaller fish, especially those in the
> juvenile or larval stage, are killed in the pumps. BiOp at 210. Those that are salvaged
> frequently do not survive the salvage process. BiOp at 338.

747 F.3d at 594-95. Delta smelt "rarely survive the salvage process." *Id*. at 606.

[3] The 2008 FWS BiOp's RPA Component 1, Action 1 requires, among other things that the CVP and SWP operate to "maintain OMR flows no more negative than -2,000 cfs (14-day average) with a simultaneous 5-day running average flow no more negative than -2,500 cfs to protect adult delta smelt for 14 days." Obeji Decl., Ex. E, ECF No. 53-7 at 4.

9

administrative record cannot be based solely on an agency's consideration of the requested documents in connection with an earlier, related decision." 2018 WL 3129849 at *9; *see also San Luis & Delta-Mendota Water Auth. v. Jewell*, No. 1:15-CV-01290-LJO-GSA, 2016 WL 3543203, at *3 (E.D. Cal. June 23, 2016) (refusing to order supplementation of the administrative record with documents contained within a prior administrative record on a related decision from an earlier timeframe absent information indicating the documents were actually considered, either directly or indirectly, by decisionmakers). Rather, the "touchstone" or "focal point" of the analysis "should be the decision-makers' actual consideration at the time of the agency action in question." *Safari Club Int'l v. Jewell*, No. CV-16-00094-TUC-JGZ, 2016 WL 7785452, at *4 (D. Ariz., July 7, 2016); *see also Wildearth Guardians v. U.S. Forest Serv.*, 713 F. Supp. 2d 1243, 1256 (D. Colo. 2010) ("The proper touchstone remains the decision makers' actual consideration, and a party moving to complete the record must show with clear evidence the context in which materials were considered by decision makers in the relevant decision making process.").

As mentioned, "[t]he 'whole' administrative record . . . consists of all documents and materials directly *or indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson*, 885 F.3d at 555 (emphasis added). A "plaintiff must identify reasonable, non-speculative grounds for its belief that the documents were considered by the decision makers involved in the determination." *Pinnacle Armor*, 923 F. Supp. 2d at 1239-40 (internal quotation omitted). For example,

> [I]f a party moves to include a study that was cited in the recommendations of subordinates, the party need not show that the decision maker read the study, but the party must show that the study was so heavily relied on in the recommendations that the decision maker constructively considered it.

*Wildearth Guardians*, 713 F. Supp. 2d at 1256; *see also Conservation Cong. v. United States Forest Serv.*, No. 2:13-CV-01922 TLN CMK, 2016 WL 10637090, at *3-4 (E.D. Cal. Oct. 12, 2016) (finding insufficient arguments based on inferences and common sense that agency considered a document;

"concrete evidence" required to rebut presumption of regularity). Another example is found in *The Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, which concerned FWS's designation of critical habitat for the piping plover. 667 F. Supp. 2d 111, 112 (D.D.C. 2009). The plaintiffs in that case wanted the agency to supplement the administrative record with an earlier BiOp covering the impacts to plover of a related federal action, namely the implementation by the National Park Service ("NPS") of an interim protected species management strategy for the Cape Hatteras National Seashore. *Id*. at 113. It was undisputed that the earlier BiOp was substantially relied upon by NPS when NPS developed the Cape Hatteras National Seashore's Interim Protected Species Management Strategy ("Interim Strategy"). *Id*. It was also undisputed that the Interim Strategy itself was before FWS when it designated the critical habitat for the plover. *Id*. However, FWS maintained it did not have the earlier BiOp before it when it designated the critical habitats. *Id*. Despite the facts that: (1) the BiOp was referenced in many documents that were in the administrative record for the habitat designation decision; (2) the BiOp acknowledged the critical habitat designation process and the impact designation would have on the Interim Strategy; and (3) the fact that some comments received on the critical habitat designation mentioned the BiOp, the court found that none of these references were strong enough to overcome the presumption that FWS designated properly the administrative record. *Id*. at 114.

In the *Golden Gate* AR Order, this Court refused to require supplementation of the administrative record with a broad range of comment letters submitted to the defendant agency in connection with the development of the Bay Delta Conservation Plan ("BDCP"), finding that, while BDCP and Waterfix are closely related projects (the latter being an offshoot of the former), "this fact alone does not mean that decisionmakers considered in connection with the development of the WaterFix BiOp every document that might belong within a hypothetical administrative record for the BDCP process." *Golden Gate* AR Order, 2018 WL 3129849 at *10. The Court reasoned:

> Generically, it makes sense that NMFS would have considered [ ] central, earlier decision documents pertaining to BDCP, but would not necessarily have considered comment letters addressing those decision documents.

> Plaintiffs suggestion that the comment letters in question all should be
> included in the present AR because NMFS was required under [NEPA] to
> review and respond to these documents in the context of developing the
> BDCP [NEPA decision documents] and because "these letters were
> directly related to the substance of the present controversy," [citation], is
> insufficient to demonstrate as a general matter direct or indirect
> consideration of the comment letters.

*Id.*

In contrast, the Court did require the agency to supplement the *Golden Gate* administrative record with a comment letter submitted in response to the release in July 2015 of a re-circulated Draft NEPA document for WaterFix itself. *Id.* The Court found that even though the document was technically produced in the context of an environmental review under a separate statute (NEPA), the defendant agency had constructively considered that particular comment letter in the context of its ESA review primarily because of the close proximity in time and related subject matter of the two review processes. *Id.*

Here, the Smelt Working Group documents more closely resemble the kind of documents for which supplementation was not required in *Golden Gate*. They pertain to how the Smelt Working Group functioned in the past under specific circumstances and in light of the processes set forth in the 2008 FWS BiOp. Plaintiffs generally assert that FWS must have considered how the Smelt Working Group process has functioned in the past in order to rely on that process as a source of future protection for delta smelt under WaterFix. ECF No. 62 at 3. Although this is a logical assertion, this is not enough. Nothing in the record suggests with any specificity that FWS necessarily would have considered these specific documents in connection with preparation of the WaterFix BiOp. The request to require FWS to supplement the record with these documents is therefore DENIED.

Plaintiffs make a more compelling argument that these documents nonetheless should be considered by the Court as extra-record evidence demonstrating that FWS failed to consider a relevant factor. That relevant factor, according to Plaintiffs, is whether the protective mechanism(s) proposed for use in WaterFix to address negative impacts on smelt from operation of the CVP/SWP export pumps,

which the record suggests will be "similar" to the mechanism(s) used in the 2008 FWS BiOp, are reasonably certain to occur. It is by now well established that "mitigation measures that are not reasonably certain to occur should be excluded from the agency's no jeopardy analysis." *Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 357 (E.D. Cal. 2007) (citing *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 481 F.3d 1224, 1241 n.16. (9th Cir. 2007), *opinion amended and superseded*, 524 F.3d 917 (9th Cir. 2008)). But, "to satisfy the 'relevant factors' exception, a plaintiff must establish more than just that the document is relevant. [T]he document in question must do more than raise 'nuanced points' about a particular issue; it must point out an 'entirely new' general subject matter that the defendant agency failed to consider." *Pinnacle Armor*, 923 F. Supp. 2d at 1234 (quoting *In re Delta Smelt Consol. Cases*, No. 1:09-CV-1053 OWW DLB, 2010 WL 2520946, at *5 (E.D. Cal. June 21, 2010)).

> [T]he "relevant factors" exception only applies when Federal Defendants fail to consider a general subject matter that is demonstrably relevant to the outcome of the agency's decision, not when specific hypotheses and/or conclusions are omitted from consideration. To hold otherwise would allow Plaintiffs to drive a truck through what is supposed to be a narrow exception to the record review rule.

*In re Delta Smelt Consol. Cases*, 2010 WL 2520946, at *5. Put another way, "[a]lthough the relevant factors exception permits a district court to consider extra-record evidence to develop a background against which it can evaluate the integrity of the agency's analysis, the exception does not permit district courts to use extra-record evidence to judge the wisdom of the agency's action." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014)

Federal Defendants argue that the Smelt Working Group documents offered by Plaintiffs do not satisfy the relevant factors exception because they add only nuance to a topic already considered and addressed by the existing record. ECF No. 59 at 17. In support of this assertion, Federal Defendants point to several pages from the 2008 FWS BiOp that "explain[] the role of the Smelt Working Group in implementing components of the reasonable and prudent alternative." *Id*. at 16 (citing FWS0000274-75;

FWS0000524-25). There is no dispute that the 2008 FWS BiOp describes the adaptive management process, including the fact that the Smelt Working Group's recommendations may be disregarded. But that begs the question of whether those recommendations regularly have been disregarded and, relatedly, the consequences of ignoring the recommendations to the overall effectiveness of any mitigation plan that might employ a similar system. In a nutshell, Federal Defendants have pointed to nothing in the record that reveals FWS considered the effectiveness of a mitigation system that utilizes the Smelt Working Group recommendation system. The Court does not agree with Federal Defendants that these documents present only "nuance" on a topic already considered in the existing record. Nothing in the cited pages of the WaterFix BiOp directly or indirectly address the issue of whether mitigation measures proposed for use in the WaterFix project are reasonably certain to occur. In at least one related case, this Court's predecessor expressed concerns about how the need for certainty in designing mitigation measures may not be satisfied by adaptive management protocols at least arguably similar (if not directly related) to those at issue here. *Kempthorne*, 506 F. Supp. 2d at 351-357 (discussing in detail why adaptive management protocol in predecessor to 2008 FWS BiOp involving consultation with Smelt Working Group was unlawfully uncertain and unenforceable). This is not a minor, nuanced issue.[4] Rather, operation of the adaptive management protocol may be central to any finding of no jeopardy in this case.

In addition, Plaintiffs have, at least preliminarily, made a showing that the record is "so inadequate" that "judicial review would be effectively frustrated" in the absence of the Smelt Working Group documents. *Univ. of Wash. v. Sebelius*, 2011 WL 6447806 at *2. In practice, this boils down to

---

[4] Nor is the court persuaded by Federal Defendants' argument that the Smelt Working Group documents should not be considered because they reflect "specific real-time decisions by FWS based on information available at the time the decision [was] made." ECF No. 59 at 17. While it is true that the Smelt Working Group notes from each meeting are "specific to physical, hydrologic, and biological conditions in the Delta at the time the meeting occurs, and are relevant to specific decisions related to CVP/SWP operations at the time such decisions are made," that would go to the weight of Plaintiffs' argument on the merits, not to the threshold question of whether or not these documents demonstrate that FWS has failed to consider the "relevant factor" of whether the protective measures set forth in the WaterFix adaptive management process are reasonably likely to occur.

14

whether supplementing the record is necessary. *WildEarth Guardians v. United States Fish & Wildlife Serv.*, No. CV-13-00151-TUC-RCC, 2015 WL 13567455, at *3 (D. Ariz. Sept. 28, 2015). The relevant factors exception does not apply where "[t]he record contains sufficient information to explain how the [agency used the information before it] and why it reached its decision." *Id.* (*quoting Cook Inletkeeper v. U.S. EPA*, 400 Fed. Appx. 239, 240-41 (9th Cir. 2010)). Here, absent the Smelt Working Group documents, there does not appear to be any material in the AR that would permit the court to evaluate whether the agency considered sufficiently the effectiveness of planned mitigation measures for smelt.

Accordingly, Plaintiffs' request that the Court consider the Smelt Working Group documents (Exhibits E-I) in the context of future motions for the limited purpose of determining whether Federal Defendants failed to consider a relevant factor, namely whether mitigation outlined by the adaptive management process is reasonably certain to occur, is GRANTED, subject to a targeted motion to strike demonstrating that the issue was considered elsewhere in the AR or that the issue is immaterial (i.e., not a "relevant factor").

**D.** **Documents Concerning Re-initiation of Consultation During Periods of Drought**

The next set of documents Plaintiffs seek to add to the AR concern Reclamation's re-initiation of consultation on the 2008 FWS BiOp during 2014 and 2015. Even if an initial consultation over a federal project took place, consultation must be re-initiated under certain circumstances. For example: "(a) [i]f the amount or extent of taking specified in the incidental take statement is exceeded; (b) [i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (c) [i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or (d) [i]f a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16. Here, the 2008 FWS BiOp itself contains a provision requiring Reclamation to re-initiate consultation if the water year is classified as dry or critically dry for two or more consecutive years.

The documents in dispute here reflect requests by Reclamation to re-initiate consultation with FWS over the impact to smelt of various proposed changes to project operations designed to address drought conditions, as well as FWS's responses to those requests:

- Exhibit K - January 31, 2014 memorandum from Reclamation to FWS requesting re-initiation of consultation on the 2008 biological opinion
- Exhibit L - January 31, 2014 memorandum from FWS to Reclamation granting Reclamation's January 31, 2014 request for re-initiation
- Exhibit M - February 27, 2014 memorandum from Reclamation to FWS regarding re-initiation of consultation on the 2008 biological opinion
- Exhibit N - March 14, 2014 memorandum from Reclamation to FWS requesting re-initiation of consultation on the 2008 biological opinion
- Exhibit O - March 14, 2014 memorandum from FWS to Reclamation granting Reclamation's request to extend the modification to minimum Delta outflows and Reclamation's request to increase Old and Middle River flows
- Exhibit P -  April 8, 2014 memorandum from FWS to Reclamation granting Reclamation's request to re-initiate consultation on the 2008 biological opinion
- Exhibit Q - memorandum from FWS to Reclamation granting Reclamation's request to re-initiate consultation on the 2008 biological opinion
- Exhibit R - October 1, 2014 memorandum from FWS to Reclamation granting Reclamation's request to re-initiate consultation on the 2008 biological opinion
- Exhibit S - January 9, 2015 memorandum from FWS to Reclamation granting Reclamation's request to re-initiate consultation on the 2008 biological opinion.

Obegi Decl., Exhibits K-S.

The documents authored by Reclamation (Exhibits K & M-N) seek the concurrence of FWS that "there will be no additional adverse effects on delta smelt or its critical habitat" caused by certain

16

drought response actions proposed by Reclamation and DWR beyond those impacts analyzed in the 2008 BiOp. The drought response actions proposed by Reclamation and DWR included waiving minimum Delta outflow requirements and allowing OMR flows to exceed those contemplated under the 2008 BiOp. *See, e.g.*, Ex. N. The documents authored by FWS (Exhibits L & O-S) conclude that the modifications requested by Reclamation will have no additional adverse impacts on delta smelt above and beyond those described in the 2008 FWS BiOp.

The record reflects that at least one Plaintiff raised concerns during the WaterFix consultation process that, given Reclamation's past history of requesting and receiving modifications to Delta outflow and OMR flow requirements, similar Delta outflow and OMR flow requirements contained within WaterFix could likewise be waived during future droughts. FWS0111271-72; FWS0112426-27; FWS0122965-73. Plaintiffs' primary argument in favor of requiring inclusion of these documents in the AR is that the AR already includes a substantially similar June 26, 2015 memorandum from FWS, in which FWS granted a request by Reclamation and DWR to increase pumping from the Delta and waive state Delta outflow requirements. *See* FWS0144144-46. Plaintiffs point out, correctly, that all the re-initiation documents they seek to add to the AR are referenced within the June 26, 2015 memorandum. *Id*. Plaintiffs maintain that because the June 26, 2015 memorandum was written "in response to" the disputed memoranda, the disputed memoranda must have been considered by FWS. ECF No. 53-1.

But, the June 26, 2015 memorandum is included in the present AR because it was submitted by the action agencies (Reclamation and DWR) to FWS as an attachment to the BA prepared by the action agencies. While FWS presumably reviewed and considered the disputed memoranda in the process of generating the June 26, 2015 memorandum, that does not mean they reviewed or considered the disputed memoranda in the process of preparing the WaterFix BiOp. As this Court previously held, inclusion in an administrative record is not warranted simply because a disputed document was discussed in another document that already is in the administrative record. *See Golden Gate* AR Order, 2018 WL 3129849 at *9. It is not enough that the disputed document may be relevant to a legal or

factual determination underpinning the agency decision. The relevant question is whether Plaintiffs have identified "reasonable, non-speculative grounds for [their] belief that the documents were considered by the agency and not included in the record." *See Pac. Shores,* 448 F. Supp. 2d at 6. Plaintiffs have failed to meet this burden as to the disputed re-initiation documents. The request to require FWS to include these documents in the AR is therefore DENIED.

As with the Smelt Working Group documents, Plaintiffs argue in the alternative that the disputed re-initiation documents should be considered as extra-record evidence under the "relevant factors" exception. As mentioned above, "to satisfy the 'relevant factors' exception, a plaintiff must establish more than just that the document is relevant. [T]he document in question must do more than raise 'nuanced points' about a particular issue; it must point out an 'entirely new' general subject matter that the defendant agency failed to consider." *Pinnacle Armor*, 923 F. Supp. 2d at 1234 (quoting *In re Delta Smelt Consol. Cases*, 2010 WL 2520946, at *5). Moreover, "the 'relevant factors' exception only applies when Federal Defendants fail to consider a general subject matter that is demonstrably relevant to the outcome of the agency's decision, not when specific hypotheses and/or conclusions are omitted from consideration." *In re Delta Smelt Consol. Cases*, 2010 WL 2520946, at *5.

Federal Defendants point to several pages of the WaterFix BiOp, indicating "the existing administrative record sufficiently addresses past and future droughts, as well as the effect of implementing the 2008 [FWS] BiOp." ECF No. 59 at 17 (citing FWS0347834-41; FWS347954-59; FWS0347984-89). Although the cited pages from the AR generally discuss (1) the 2008 FWS BiOp RPA actions designed to protect smelt (FWS0347834); (2) the fact that Reclamation and DWR petitioned <u>state</u> regulators in 2014, 2015 and 2016 to temporarily modify <u>state</u> Delta outflow standards (FWS0347840); and (3) how the 2008 FWS BiOp RPAs have at times "resulted in <u>reduced</u> pumping rates in the South Delta through negative OMR <u>limits</u>" (FWS0347955 (emphasis added)), they do not appear to address the question of whether, as part of preparing the WaterFix BiOp, FWS considered whether the past pattern of permitting deviations from the 2008 FWS BiOp RPA undermines the

reasonableness of relying on any similar protective measures in WaterFix. Again, the Court agrees with Plaintiffs that this is not a question of nuance; rather, this "relevant factor" at least arguably goes to the heart of the mitigation measures proposed for implementation as part of WaterFix.

The question then becomes whether Plaintiffs have made a showing that the record is "so inadequate" on the question of drought-related changes to mitigation measures that "judicial review would be effectively frustrated." *Sebelius*, No. C11-625RSM, 2011 WL 6447806, at *2 (W.D. Wash. Dec. 22, 2011) (quoting *Animal Def. Council*, 840 F.2d at 1436-37). Unlike with the Smelt Working Group documents which appear to be unique relative to the rest of the AR, Plaintiffs concede that the record already contains one example of how Delta outflow and OMR flow requirements were waived during a period of drought: the June 26, 2015 memorandum. Plaintiffs therefore can frame an argument regarding the "relevant factor" of drought related changes to mitigation measures using that document. But, that one document is too thin on detail to permit effective judicial review of this issue. It presents a single datapoint in what Plaintiffs maintain (and the disputed documents arguably demonstrate) is a pattern of waiving Delta outflow and OMR flow requirements in times of drought. The June 26, 2015 document also presents little to no explanation of the reasoning underlying FWS's conclusion that waiving these requirements would cause no additional harm, as FWS at least in part adopted reasoning contained within a "Biological Review" referenced in the June 26, 2015 document. At least one of the disputed documents (Exhibit M) offers a great deal of additional detail to help understand the nature of the waivers and how those waivers may (or may not) be material to the effectiveness of the mitigation measures overall.

The Court is mindful that its role is a limited one. However, n the present context, it appears likely that it will be asked to determine whether, by adopting a drought response procedure that is similar[5] to that which produced the waivers described in the disputed documents, the agency complied

---

[5] Federal Defendants protest that the processes implemented by the agencies in 2014 and 2015 is not "nearly identical" to the

19

with the APA's requirement that the agency's decision "be neither arbitrary nor capricious." *San Luis v. Locke*, 776 F.3d at 993. More specifically, the Court will likely be asked to determine whether the FWS considered whether the mitigation measures included within the WaterFix BiOp are reasonably certain to occur. This inquiry is likely to involve a close examination of the proposed mitigation measure to determine whether the record supports a finding that the mitigation measure is reasonably certain to occur. *See AquAlliance v. U.S. Bureau of Reclamation*, 287 F. Supp. 3d 969, 1072 (E.D. Cal. 2018) (reviewing cases and requiring clarification on remand of how mitigation measure would be implemented). A court must "strike a difficult balance" in reviewing the mitigation implementation strategy outlined in the administrative record. *See Oregon Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 1002 (D. Or. 2010). "The court cannot substitute its judgment for that of the expert agency tasked with adaptively managing [a natural resource], however, the court must also ensure that there are substantive measures in place to deal with noncompliance." *Id.* If an agency does not have in place "substantive measures" to ensure with reasonable certainty the implementation of any material aspect of its mitigation strategy, this could result in a finding that the agency has violated the APA for failing to consider a "relevant factor." But, the "adaptive" nature of "adaptive management" and the technical nature of the decisions made in the context of the adaptive management strategies at issue in this case mean that this inquiry is likely to be highly fact-specific.[6] In the absence of reasonably detailed information about past practices (insofar as those past practices may be indicative of future behavior) under the adaptive management system in question, the Court may be unable to effectively exercise

---

drought contingency plan proposed for implementation under WaterFix. ECF No. 59 at 17 (citing FWS0202713). But, the record citations provided thus far to the Court reveal, at best, only a vague outline of the drought contingency processes that will be implemented under WaterFix. *See* FWS0202713. Other record citations indicate that drought management will proceed in accordance with "past experience." FWS0114307. The Court is unpersuaded, at least at this stage, that the approach to implementation of mitigation measures during drought will be materially different under WaterFix vis-à-vis past practice.

[6] Although it is not immediately obvious whether the drought response approach to be implemented under WaterFix is formally considered "adaptive management" by the agency, it certainly appears to walk and talk like "adaptive management" insofar as it involves periodic meetings of experts, followed by tailoring responses specific to prevailing conditions. *See* FWS0114307; FWS0202713.

judicial review. Accordingly, Plaintiffs' request that the Court consider the disputed re-initiation documents (Exhibits K-S) for the limited purpose of determining whether Federal Defendants failed to consider a relevant factor, namely whether mitigation measures are reasonably certain to occur, is GRANTED, again subject to a targeted motion to strike demonstrating that the asserted "relevant factor" was considered elsewhere in the AR or is simply immaterial.

## IV. CONCLUSION AND ORDER

For the reasons set forth above, as to the documents remaining in dispute:

(1) Plaintiffs' motion to require FWS to add the disputed documents to the AR is DENIED; and

(2) Plaintiffs' motion for the Court to consider the disputed documents as extra record evidence under the relevant factors is GRANTED, subject to a targeted motion to strike that demonstrates either that the asserted "relevant factors" are considered elsewhere in the AR or are immaterial.

(3) Any such motion to strike may be no longer than five pages in length and must be filed no later than 45 days in advance of the motion for summary judgment filing deadline. Thereafter, Plaintiffs shall have ten days to file an opposition of equal or lesser length. Unless the Court notifies the parties otherwise, the motion will be decided on the papers without oral argument.

IT IS SO ORDERED.

Dated:   **August 16, 2018**            **/s/ Lawrence J. O'Neill**
                                 UNITED STATES CHIEF DISTRICT JUDGE